SMITH, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*February 5 — May 15, 1900.*

*Railroads: Personal injury: Court and jury: Special verdict: Splitting up damages: Appeal: New trial.*

1. In an action for personal injuries received in a railway collision, a physician who examined the plaintiff about six months after the injury, with a view to testifying on the trial, testified that he then discovered a displacement of the semilunar cartilage of the left knee and replaced it, but did not disclose the fact to the family physician although the latter was present at part of the examination. No symptoms of any such displacement were discovered, either by the same physician upon both prior and subsequent examinations, or by plaintiff's family physician who examined her repeatedly and attended her to the time of the trial, and no reference thereto was made in the complaint unless under a general allegation that plaintiff was "otherwise injured." It was admitted that a person could not walk or stand upon a limb during such a displacement, and that plaintiff walked without assistance immediately after the accident and from time to time thereafter. *Held,* that a finding of the special verdict that said cartilage was displaced by the collision was unsupported by the evidence, especially in view of the testimony of all the other medical experts that upon the admitted facts there could have been no displacement by the accident.

2. In an action for personal injuries the jury by a special verdict awarded plaintiff $4,000 for displacement of the semilunar cartilage, $200 for impairment of hearing, and fixed her damages generally at $5,000. On appeal the evidence was held insufficient to sustain a recovery for the displacement of said cartilage. *Held,* that a new trial would not be granted, but the judgment would be affirmed except as to the damages awarded for such displacement.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Affirmed in part; reversed in part.*

For the appellant there were briefs by *Fish, Cary, Upham & Black,* attorneys, and *Edward M. Hyzer,* of counsel, and oral argument by *John T. Fish.*

*J. C. Kerwin,* for the respondent.

The following opinion was filed March 20, 1900:

CASSODAY, C. J. This action was commenced September 21, 1897, to recover damages for personal injuries sustained by the plaintiff on the night of June 29, 1897, at West Chicago, while riding as a passenger for hire on the sleeping car at the rear end of the train running from Chicago to Omaha, by reason of the negligence of the defendant. The defendant's answer admitted that one of its employees, through inadvertence and mistake, failed to observe a well-known signal, and by reason thereof that train, while standing upon the track, was collided with and run into by another of the defendant's trains coming upon the same track from the rear, and took issue only with the allegations of the complaint as to whether the plaintiff sustained any injuries, and, if so, the extent of such injuries.

At the close of the trial, the jury returned a special verdict to the effect (1) that the plaintiff was injured by the collision mentioned; (2) that the semilunar cartilage on the inside of her left knee was displaced by the accident; (3) that she also sustained injury which caused an impairment of her hearing in her left ear; (4) that she did not receive any injury which caused heart disease; (5) that they awarded damages to the plaintiff for such injury of displacing the semilunar cartilage on the inside of her left knee to the amount of $4,000; (6) that they awarded damages to the plaintiff for such impairment of her hearing to the amount of $200; (8) that the plaintiff had sustained damages by reason of her injuries to the amount of $5,000.

Thereupon the defendant moved the court, upon the undisputed evidence, to amend such special verdict by striking out the.answer of the jury to the second and fifth questions, upon the grounds that they are contrary to the law and evidence, and are not supported by the evidence, and to change the answer of the jury to the eighth question, so that it will read $1,000, in order to conform to the verdict of the jury as thus amended, and with the undisputed evidence, which motion was denied, and the defendant then and there excepted. The court also refused to set aside the verdict and grant a new trial, and ordered judgment to be entered in favor of the plaintiff, and against the defendant, for $5,000 damages and costs, making in all $5,112. From the judgment so entered the defendant brings this appeal.

The defendant makes no serious objection to so much of the special verdict as awarded to the plaintiff $1,000 damages; that is to say, $200 damages for impairment of her hearing, and $800 for other damages, exclusive of the $4,000 awarded by reason of the displacement of the semilunar cartilage on the inside of her left knee. But the defendant contends that the complaint fails to allege, and the evidence fails to establish, any such displacement of the semilunar cartilage. The portion of the complaint alleging the injury reads as follows: "That, by reason of such collision, . . . the plaintiff . . . was thrown with great force and violence upon the seats or partitions between the seats in said sleeping car, and one of the upper berths of the said car was violently detached from its position in said car, and hurled with great force and violence against the person of the said plaintiff, striking her upon the left side of her head and ear, and throwing her with great force against the seats or floor of said car, pinning her to the seat by reason of the great weight of said upper berth, and that, by reason of the force of such blow, occasioned by the said collision, the said plaintiff received severe bruises upon the left side of her head, and

serious and permanent injury to her left ear, so that the hearing thereof has been destroyed; that she received a permanent injury to one of the bones of her left thigh, from the consequences of which she has suffered great pain and inconvenience, and is yet unable to use the said limb as before, and has become lame and disabled therein, and permanently deprived of the full or former use of said limb; that plaintiff also suffered severe bruises upon her right side and back, and to her left arm, *and was otherwise injured in and about her person, particularly in the region of the head and neck, and was especially injured in her spinal cord in the region of the head and neck*, to such an extent that she is advised and believes she will never entirely recover therefrom; . : . that the shock of the impending danger was such that she was unable to move or take any steps for her own safety, and this shock, together with that occasioned by the pain from the subsequent injuries, and the fear caused by the knowledge of the impending collision, all so shocked and injured her entire nervous system and brain that, as she is advised and believes, there is permanent and serious damage done thereto, and that she will never wholly recover therefrom; that in consequence of the said injuries this plaintiff suffered at the time extreme, continuous, physical pain, and became immediately unconscious from the effects of such collision and injuries; that, upon regaining consciousness, the continued, excessive pain brought on another term of unconsciousness, and the pain and tortures aforesaid continued with great severity, and still continue, so that the plaintiff is almost wholly deprived of the power to perform her household duties, and is entirely deprived of the power to enjoy life as heretofore, the shock to her nervous system being such that she has become irritable, and is easily annoyed, and has become greatly depressed; suffers from frequent headaches, and from constant pain, both in her limb and head; from the loss of hearing in her left ear; from an

unduly active and rapid, tumultuous pulse; and has since said injuries, at very frequent intervals, been subjected to the discomfort and danger of a serious heart trouble, which plaintiff is advised and believes is permanent, and extremely dangerous to her health and life."

It is undisputed that the plaintiff was twenty-seven years of age at the time of the accident; that in the year 1895–96 she was treated by her physician for heart trouble; that he pronounced her well some time before the accident; that for a year prior to the accident she did her own work; that she and her grandmother took passage on the defendant's train at Neenah, June 29, 1897, for California, as members of the Christian Endeavor excursion; that a week prior to starting, at the suggestion of her husband, she was examined by a physician to see if she was well enough to go; that the collision occurred about 1 o'clock a. m.; that at the time of the collision she became unconscious; that soon after the collision she found herself on the bank outside of the car; that she thereupon walked, without assistance, to the station near, but that it was almost impossible to do so, and she fainted while there; that she and her grandmother remained at the station until nearly 4 o'clock a. m., and while there a physician bandaged her knee, and gave her a bottle of brandy, and the plaintiff telegraphed her husband that they were all right, and would go on; that about 4 a. m. they took a train provided, and continued their journey west; that such passengers as were very seriously injured were removed to a certain hotel, while those less seriously injured were removed to another hotel; that the plaintiff so continued the journey because she thought she would get over her injuries right away; that she got the next treatment at Boone, Iowa, where a physician came upon the train at that place, and bandaged her knee, and ordered hot-water applications to be furnished every fifty miles; that she continued such applications until she reached Stockton,

California; that she was there treated by a physician, who prescribed a liniment and bandage for her knee and side, and that she bandaged her knee herself; that while in California she visited with people there, went around down town, took the street cars, did not walk very much, was only able to walk a certain distance, and suffered a great deal of pain from her head and side and knee; that the pain lasted six weeks; that it was hard for her to breathe by reason of 'her heart, which would beat rapidly and irregularly, and she was troubled with suffocation; that she had a great deal of pain in her head,— on the left side, back of her ear and neck; that she was unable to straighten her leg, or to close it more than at right angles; that her lameness grew worse, and the leg ached severely after walking; that in going to California she got off the car for meals at Cedar Rapids, Denver, Leadville, and other places; that at San Francisco she walked three or four blocks, and then took a boat for Stockton, and remained there, or near there, with relations, about four weeks; that she was at Monterey, California; that she remained 'in California almost as long as she intended when she left home,— lacked only two or three days; that she started home from California August 7, 1897, and came by the Northern Pacific Railway, and by the way of Portland, Oregon; that she reached Neenah, August 13, 1897; that after reaching home she attended the minstrels upstairs at the Opera House, about six blocks from her home, and did not remember whether she rode or walked; that she also went to the office of her family physician for examination and treatment; that he prescribed liniment and a rubber bandage for her knee, a prescription for her head and ear, and also for her nervousness and her heart, which she used; that she had another physician at the house to see how bad her injuries were, but he did not prescribe.

Dr. Ritchie, the plaintiff's family physician, testified in behalf of the plaintiff to the effect that she called upon him

about August 19, 1897, and he examined her, and measured her two knees, and found but little, if any, difference in their size; that she could bring her left knee to a right angle, and perhaps a little more, but could not straighten it into about five degrees, and then it would give her pain; that he did not then think that the knee would result seriously, and advised her to use it by walking; that the injury was a sprain, accompanied by other trouble; that he thought the surface of the articulatory bones were injured, but that there had been no fracture of the bone; that the cartilage between the bones is not always injured by a sprain; that a tearing of the ligaments may allow one bone to slip past the other without injury to the cartilage,— the cartilages move on themselves, without friction; that there was no evidence of injury to the muscles; that a sprain in the joint may or may not affect the position of the cartilage; that by keeping the leg straight, and reducing the inflammation, the cartilage may become normal; that he found tenderness over the inside of the large bone of the knee, with some discoloration and tenderness on the anterior surface of the leg, and below the kneepan, and just under the kneepan in front; that such discoloration was less than it had been, and was then fading, and within four or six weeks entirely disappeared; that she walked lame; that he found no anatomical lesion, and no injury to the drum of the ear; that he examined her again a week after, but found no marked difference, except less discoloration; that his visits in attending her were somewhat irregular,— would average, perhaps, once a week; that he consulted Dr. Gill in January, 1898, in regard to the injuries and a change of treatment; that they concluded to put the knee in a plaster cast or bandage, so as to prevent the joint from acting, and did; that after about three weeks he took it off, and after a day or so put it on again for three weeks 'longer, but there was not much perceptible change, except the knee was a little stiffer for a short time.

Dr. Gill testified, in behalf of the plaintiff, that he first examined her at the request of her attorney, and with a view of giving testimony in the suit which was about to be brought, September 12, 1897, and subsequently, at the request of her husband, January 3, 1898, and May 4, 1898; that he spent three or four hours in examining her, September 12, 1897; that he measured both of her knees, and found the left one eighth of an inch smaller; that she could only bend her left leg at about right angles, and could not quite straighten it; that there was tenderness about the knee joint, both at the upper end of the lower larger bone and the upper bone, but there was no swelling of the knee joint at that time; that the tendons reflex was present in a normal degree at that time, and she limped when she walked; that he next examined her for three or four hours on January 3, 1898; that, upon manipulating the knee, he found it was less free in its action than it had been; that immediately above the upper end of the lower bone he found a slight projection; that by pressing upon it it slipped back into its natural position; that the part so displaced was known as the cartilage in the joint of the knee,— called the semilunar cartilage; that there was more tenderness than at any time before or afterwards, but there was practically no difference in the circumference of the knee; that the effect of loosening the cartilage is that it becomes displaced, and the joint catches, and the injury is permanent; that he discovered nothing of the kind when he examined the knee, September 12, 1897, but that it might have been loose at that time, without being projected; that a physician might examine it a dozen times without finding it; that when it slips out or protrudes it may be found, but not at other times; that Dr. Ritchie was there during a part of that examination, but that he kept still about it, and did not mention it to Dr. Ritchie; that he found nothing of the kind when he examined the plaintiff for three or four hours on

May 4, 1898, nor when he examined her a few days before the trial, which occurred September 2, 1898; that, in case of injured tissue, the semilunary cartilage may be displaced by relaxation of the ligaments of the knee, not in a healthy knee without a separation or stretching of the ligaments, and without tearing it, but that he never knew of such a case in his practice, and never saw such a case, except one that he cut down; that no immediate effect follows such displacement,— sometimes for a few moments the knee is perfectly natural, then swelling follows shortly afterwards; that it is often true, as stated in a standard text-book of surgery, that displacement "may occur in health, the coronary ligament being torn away; the symptoms are sudden and severe pain, with inability to stand or walk, the leg being partially flexed and the joint locked,"— but he did not think it would apply in every case; that it might become displaced, and immediately become replaced, without the person knowing what had occurred; that he found no evidence of floating cartilage at any time; that sometimes there are hysterical joints, which deceive the most practiced physicians; that the plaintiff could not have walked at all at any time when the semilunar cartilage was displaced; that the semilunar cartilage, when so displaced, protruded perhaps one fourth or three eighths or one half an inch.

The physician who attended the plaintiff at Boone, Iowa, testified to the effect that he found a contusion above the left knee, and in front,— a discoloration of the skin, with a slight swelling about the knee; that there was no trouble in straightening the limb or flexing it, except she said it caused her slight pain; that he observed varicose veins in her limbs; that he prescribed bandage and hot water bag to be used on the train; that, as a rule, the semilunar cartilage is not displaced without a rupture of the ligaments; that, in case of unnatural displacement, the patient cannot stand upon the foot or walk.

Dr. Sifton testified to the effect that the semilunar cartilage could not be displaced unnaturally without tearing the ligaments; that if the ligaments were ruptured, and it got out of place, the joint would swell very quickly, and it would be a very serious injury to the joint, and it could not be used at all, and a person could not walk or stand upon it while displaced; that after it had been displaced and replaced there would be soreness until the ligaments healed, and then it would usually be well again; and, in answer to hypothetical questions covering the admitted facts, he testified, in effect, that there was no evidence of displacement of the semilunar cartilage.

Dr. Steel testified to the effect that he examined the plaintiff's knee and heart four or five days before the trial; that the plaintiff complained of no tenderness whatever at the edge of the semilunar cartilage or about the head of the tibia; that he could discover no evidence whatever from the examination of the knee that the semilunar cartilage had ever been displaced, nor of any tearing or rupture of any of the ligaments of the knee joint; that the semilunar cartilage could not be thrown out three fourths of an inch beyond its normal position without rupturing the coronary fibers that hold it; that in its normal condition it had a slight movement, the coronary ligaments being sufficiently loose to permit such movement; that he discovered no evidence that there had been any rupture of any of the fastenings, nor that the bones were bruised or diseased in any way, nor that there had been any fracture of any portion of the bone; that some displacement of the semilunar cartilage might come from a wrench; that, if it was at all serious, there would be more or less inflammation; that it is one of the most marked symptoms of displacement that the leg is fixed in a flexed condition, so that it cannot be straightened until it is put back; that there could be no displacement by an accident where the person walked immediately after the accident.

He answered the hypothetical question the same as Dr. Sifton.

Drs. Corbett and Roose gave similar testimony

We have thus given the general outlines of the evidence bearing upon the question of the displacement of the semilunar cartilage of the knee in question. It is overwhelmingly established, and practically admitted, that the plaintiff could not walk or stand upon that limb at any time during such displacement. It stands admitted that, as soon as the plaintiff got over the shock of the accident, she walked, unassisted, for a considerable distance to the depot; that she repeatedly walked from the car to the eating houses along the route to California; that in San Francisco she walked several blocks. to the boat; that at Stockton and vicinity, in that state, she walked repeatedly; that, after being absent from home a month and a half, she returned by way of Oregon and the Northern Pacific; that after returning home she from time to time walked several blocks; that the action was not commenced until five weeks after her return home, during which time she had been examined between three and four hours. by Dr. Gill, and repeatedly examined by her family physician, with the view of testifying as to her condition upon the trial of the action; that neither of them claims to have discovered any symptom of such displacement at any of such examinations; that no reference to any such displacement is found in the complaint, notwithstanding there are numerous items of damages alleged; that it is only claimed to be covered by the clause, " otherwise injured in and about. her person, particularly in the region of the head and neck," and especially in the spinal cord in the region of the head and neck; that the family physician continued to attend her for more than a year, and down to the time of the trial, without ever at any time having discovered any evidence of such displacement; that he was present at a part of the ex-

:amination of the plaintiff by Dr. Gill, January 3, 1898, and which was more than six months after the accident; that Dr. Gill testified that at that time, while manipulating the knee, he discovered such displacement and replacement, but never disclosed the fact to such family physician until the trial; that he saw no evidence of such displacement when he subsequently examined her in May, nor just before the trial in September, 1898.

In our judgment, the finding of the jury that the semilunar cartilage of the plaintiff's left knee was displaced by the accident is not sustained by the evidence, especially in view of the testimony of the other medical experts that, upon the admitted facts, there could have been no such displacement by the accident. If there was a displacement and replacement January 3, 1898, as stated, still the cause of it is purely conjectural, especially as nothing of the kind was ever known to exist, before or since, down to the time of the trial. We must hold that such finding of the jury was contrary to the undisputed evidence. The refusal of the court to so charge the jury was error. So the submission of that question to the jury was error. So it was error to refuse to set aside the answers of the jury to the second and fifth questions submitted, and to modify their answer to the eighth question accordingly.

Counsel for the plaintiff asked that in case we should so hold then that we should grant a new trial; that, by reason of the special verdict splitting up the damages, the plaintiff had not recovered as much for other damages as she otherwise would. Of course, a trial court might abuse its discretion by so splitting up the damages as to confuse and mislead the jury, but we do not think it was done in this case. The eighth question gave the jury plenty of opportunity to find general damages, not particularized. In view of the seeming doubt as to the right to recover damages, upon the evi-

dence, for displacement of the semilunar cartilage, the court very wisely submitted that question separately. We perceive no good reason for granting a new trial.

*By the Court.*— That part of the judgment based upon the finding of $4,000 damages for displacement of the semilunar cartilage is reversed, and the balance of the judgment is affirmed. No costs are allowed to either party, except the plaintiff must pay the fees of the clerk of this court.

The plaintiff moved for a rehearing, and the motion was denied May 15, 1900.